```
 1                 UNITED STATES DISTRICT COURT
                   WESTERN DISTRICT OF TEXAS
 2                      AUSTIN DIVISION

 3  UPH HOLDINGS, INC., ET AL    ) Docket No. A 13-CA-748 SS
                                 )              A 13-CA-766 SS
 4                               )              A 13-CA-847 SS
                                 )
 5  vs.                          ) Austin, Texas
                                 )
 6  LEAP WIRELESS INTERNATIONAL, )
    INC., CRICKET COMMUNICATIONS,)
 7  INC., ET AL                  ) October 18, 2013

 8                      TRANSCRIPT OF ORAL ARGUMENTS
 9                   BEFORE THE HONORABLE SAM SPARKS

10

11  APPEARANCES:

12  For the Plaintiff:        Ms. Patricia B. Tomasco
                              Ms. Jennifer F. Wertz
13                            Jackson Walker
                              100 Congress Avenue, Suite 1100
14                            Austin, Texas 78702

15                            Mr. Scott DeShazo
                              DeShazo & Nesbitt
16                            809 West Avenue
                              Austin, Texas 78702

17

18  For T-Mobile USA:         Mr. William S. Sugden
                              Alston & Bird
19                            One Atlantic Center
                              1201 West Peachtree Street
20                            Atlanta, Georgia 30309

21

22  For Sprint Communications: Ms. Pamela A. Hopper
                              McGuire Woods
23                            816 Congress Avenue, Suite 940
                              Austin, Texas 78701

24

25
```

1    **(Appearances Continued:)**

2    For Leap Wireless:          Mr. Eric J. Taube
                                 Hohmann, Taube & Summers
3                                100 Congress Avenue, Suite 1800
                                 Austin, Texas 78701

4
                                 Ms. Suzanne Toller
5                                Davis Wright Tremaine
                                 505 Montgomery Street, Suite 800
6                                San Francisco, California 94111

7    Court Reporter:             Ms. Lily Iva Reznik, CRR, RMR
                                 501 West 5th Street, Suite 4153
8                                Austin, Texas 78701
                                 (512)391-8792

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Proceedings reported by computerized stenography, transcript
     produced by computer.

| | | |
|---|---|---|
| 14:15:15 | 1 | THE COURT: All right. I've got 13-CA-748, 13-CA-766, |
| 14:15:22 | 2 | 13-CA-847, UPH Holdings against whoever was in the telephone |
| 14:15:32 | 3 | book. |
| 14:15:40 | 4 | MS. TOMASCO: Your Honor, Patty Tomasco and with me is |
| 14:15:42 | 5 | Jennifer Wertz on behalf of UPH Holdings with respect to the |
| 14:15:46 | 6 | Leap, Cricket and T-Mobile adversary proceedings. |
| 14:15:54 | 7 | MR. DESHAZO: Your Honor, Scott DeShazo on behalf of |
| 14:15:57 | 8 | the plaintiffs in the 778 case. Mr. Swan is the guy that |
| 14:16:01 | 9 | couldn't make it down for the -- |
| 14:16:02 | 10 | THE COURT: I think I either had one or two call in. I |
| 14:16:08 | 11 | thought one from the west coast, one from the east coast, and I |
| 14:16:10 | 12 | told both of them the same thing: I only had one line, but if |
| 14:16:14 | 13 | they'd make arrangements. But then, one of them talked with my |
| 14:16:18 | 14 | law clerk, and then, he decided he didn't need to be here. |
| 14:16:22 | 15 | MR. DESHAZO: That's the one I'm on. |
| 14:16:23 | 16 | THE COURT: Okay. I've got another one that was |
| 14:16:25 | 17 | supposed to call in from the east coast. Who is that? |
| 14:16:29 | 18 | MS. HOPPER: Your Honor, this is Pamela Hopper. |
| 14:16:30 | 19 | I am here for Sprint Communications and you're speaking |
| 14:16:32 | 20 | about David Swan. He sent me a message, just a moment ago, |
| 14:16:37 | 21 | saying he's been trying to get into the courtroom for about ten |
| 14:16:39 | 22 | minutes and hasn't had any luck. I've asked him to try again. |
| 14:16:43 | 23 | I'm not sure. |
| 14:16:51 | 24 | THE COURT: All right. I wish people couldn't get into |
| 14:16:54 | 25 | the room -- to the court. All right. |

| | | |
|---|---|---|
| 14:16:58 | 1 | MR. TAUBE:  Your Honor, good afternoon.  Eric Taube on |
| 14:17:00 | 2 | behalf of Leap Wireless International and Cricket Communications, |
| 14:17:04 | 3 | Inc.  And, your Honor, if I could, I'd like to introduce to the |
| 14:17:06 | 4 | Court Suzanne Toller with the Davis Wright firm out of San |
| 14:17:10 | 5 | Francisco.  Ms. Toller has a motion pro hac vice pending, your |
| 14:17:13 | 6 | Honor.  It was filed earlier this week. |
| 14:17:14 | 7 | THE COURT:  Okay.  Well, if I haven't signed it, I will |
| 14:17:16 | 8 | sign it. |
| 14:17:18 | 9 | MR. TAUBE:  Thank you. |
| 14:17:19 | 10 | MR. SUGDEN:  Your Honor, Will Sugden with Alston & Bird |
| 14:17:22 | 11 | on behalf of T-Mobile.  I have filed a pro hac motion in the |
| 14:17:26 | 12 | underlying adversary proceeding in bankruptcy court.  I've not |
| 14:17:30 | 13 | filed one in this case.  My associate contacted your clerk and |
| 14:17:34 | 14 | said that that will be acceptable.  So I have not filed a pro hac |
| 14:17:39 | 15 | motion in this court, but I'd be happy to. |
| 14:17:41 | 16 | THE COURT:  You probably ought to.  But the fact that |
| 14:17:46 | 17 | you have an associate who's a member of the court is a green |
| 14:17:51 | 18 | light. |
| 14:17:52 | 19 | MR. SUGDEN:  Okay.  We will get that on file on Monday. |
| 14:17:54 | 20 | Thank you very much, your Honor. |
| 14:17:55 | 21 | THE COURT:  You're welcome. |
| 14:18:01 | 22 | Okay.  I have an agreed motion for extension of time to |
| 14:18:06 | 23 | file a brief, a joint motion that the whole thing has been fully |
| 14:18:13 | 24 | briefed, and then, motion for leave to exceed the page limits, |
| 14:18:20 | 25 | and a motion to appear pro hac vice.  But the main thing I have |

14:18:26  1  is that y'all want me to pull this out of bankruptcy.

14:18:34  2          I'm setting right now for October of 2015.  That's the

14:18:40  3  next trial date I have.  I filled up September this morning on

14:18:45  4  people that could reach us by phone.  So that will give you an

14:18:53  5  idea of what is going on.  I really invited you here for you to

14:19:00  6  give me kind of a bird's-eye view of this.  It appears that the

14:19:04  7  issue is pretty much the same in all of these cases.  I tried to

14:19:12  8  do some reading.  Makes little sense.  This issue was presented

14:19:17  9  to the California PUC twice.  They rejected it because there was

14:19:28 10  some case in Washington, and they thought the Feds would

14:19:34 11  determine it.  Then nobody seems to determine it.

14:19:44 12          So why in the world wouldn't I make y'all go to the

14:19:48 13  Texas PUC?

14:19:49 14          MS. TOMASCO:  Your Honor, the Texas --

14:19:50 15          THE COURT:  At least they'll determine it.

14:19:52 16          MS. TOMASCO:  Your Honor, the Texas PUC will not --

14:19:55 17  will not -- would not take jurisdiction over this.  They don't

14:19:57 18  have the jurisdiction over this particular issue.

14:20:00 19          If I could, I could explain further where we are with

14:20:02 20  the bankruptcy and --

14:20:04 21          THE COURT:  I'm not worried about the bankruptcy.  I'll

14:20:07 22  apply the law.  You can make that argument when -- you just tell

14:20:10 23  me what y'all are looking for.

14:20:12 24          You're looking for if there is a charge, and if there

14:20:15 25  is a charge, how much is the charge for one outfit who's

14:20:23  1  terminating a call who doesn't have a contract with the original

14:20:26  2  call, as I understand it.

14:20:27  3          MS. TOMASCO:  I could hand up a chart, your Honor.

14:20:28  4          THE COURT:  Sure.  You might hand one to the more

14:20:36  5  important person right here.

14:20:46  6          MS. TOMASCO:  Your Honor, we've attempted to simplify

14:20:48  7  the issues that are at stake.

14:20:53  8          THE COURT:  Do you have another chart?

14:20:55  9          MS. TOMASCO:  Well, it's just one chart and it will

14:20:58  10  show there are two types of traffic at issue, both of which are

14:21:02  11  being sought in the complaints filed by this debtor.  The debtors

14:21:06  12  consist of eight interrelated corporations that filed bankruptcy

14:21:09  13  on March 28th of 2013, in large part, due to the nonpayment by

14:21:14  14  defendants of significant wireless to the network of the

14:21:22  15  plaintiffs.

14:21:22  16          THE COURT:  So if it was filed to the bankruptcy, why

14:21:26  17  wouldn't this be a core proceeding?

14:21:28  18          MS. TOMASCO:  Well, there's significant debate about

14:21:31  19  whether or not this is a core proceeding.  With respect to

14:21:33  20  Sprint, with whom Mr. DeShazo represents, they filed the proof of

14:21:36  21  claim.  There's a good argument that Sprint's proof of claim

14:21:40  22  causes this all to be a core proceeding because the proof of

14:21:44  23  claim submits yourself to the jurisdiction of the bankruptcy

14:21:47  24  court, and it all becomes part of the resolution of the

14:21:51  25  debtor-creditor relationship.

14:21:53  1        With respect to T-Mobile and I'm going to call them

14:21:55  2   Leap, L-E-A-P, or Cricket, they did not file proofs of claim.

14:22:00  3   And so, we're talking about a classic augment the estate,

14:22:04  4   related-to proceeding.  The only way it becomes core is if you

14:22:09  5   believe that 542 gives us core jurisdiction to augment the

14:22:15  6   estate.

14:22:15  7        Now, 542 is the turnover provision that provides for if

14:22:19  8   you own -- if you owe a liquidated debt to the estate and you

14:22:23  9   fail to turn it over, it's essentially you have to turn it over,

14:22:26 10   give it up.  When it becomes more controverted, the cases kind of

14:22:31 11   vary as to whether or not that is a core proceeding; and so,

14:22:34 12   there may be a large room for argument that with respect to

14:22:38 13   simply augmenting the estate, you get into the classic In Re:

14:22:41 14   Wood, you know, line of cases that led to -- that led to the

14:22:48 15   marathon reforms in the early 1990s.

14:22:54 16        THE COURT:  I find that -- I never can find agreement

14:23:00 17   between bankruptcy lawyers as what is a core.  What is -- in the

14:23:05 18   Fisher case, what is the phrase?

14:23:08 19        LAW CLERK:  Critical mass.

14:23:09 20        THE COURT:  Critical mass.  The Supreme Court in the

14:23:14 21   Michigan Grutter case created the term "critical mass," and I

14:23:23 22   asked all of the lawyers on both sides -- and they had plenty of

14:23:27 23   lawyers, actually more than y'all have -- and nobody could define

14:23:31 24   the word "critical mass."  So we had to define it --

14:23:31 25        MS. TOMASCO:  Well --

| | | |
|---|---|---|
| 14:23:37 | 1 | THE COURT:  No.  I'm an old man, it's been a long day, |
| 14:23:39 | 2 | so you have to listen for a minute. |
| 14:23:41 | 3 | MS. TOMASCO:  So what I would say with respect to that, |
| 14:23:44 | 4 | your Honor, if you look at the chart that we've prepared after -- |
| 14:23:48 | 5 | and this is -- |
| 14:23:49 | 6 | THE COURT:  Well, part of the statute doesn't care if |
| 14:23:51 | 7 | it's core or not.  Part of the statute says if it's the federal, |
| 14:23:57 | 8 | an Article III judge has to do it. |
| 14:24:00 | 9 | MS. TOMASCO:  There's no argument but that we have |
| 14:24:02 | 10 | related-to jurisdiction.  So the venue is proper here because the |
| 14:24:07 | 11 | bankruptcies are here.  The question is whether or not it's core. |
| 14:24:11 | 12 | And I would submit to you, even if it's not core, you don't have |
| 14:24:15 | 13 | to withdraw the reference.  The only reason why you would need to |
| 14:24:19 | 14 | withdraw the reference is if they were able to -- there's the |
| 14:24:25 | 15 | power issue in Stern vs. Marshall whether or not a bankruptcy |
| 14:24:28 | 16 | court can enter a final order.  If it's not core, the bankruptcy |
| 14:24:31 | 17 | court does not have that power. |
| 14:24:34 | 18 | If -- |
| 14:24:36 | 19 | THE COURT:  That's what we think right now. |
| 14:24:37 | 20 | MS. TOMASCO:  That's what we think right now.  Whether |
| 14:24:39 | 21 | you agree with the Supreme Court or not, that's the law as it |
| 14:24:42 | 22 | stands right now. |
| 14:24:43 | 23 | So what I'm here to say is, let's be efficient.  I have |
| 14:24:48 | 24 | got 140 of these to file.  And I've got -- and part of this is -- |
| 14:24:56 | 25 | THE COURT:  In Re: Crescent, I have over 400 cases. |

| | | |
|---|---|---|
| 14:25:02 | 1 | They're just going to have to -- |
| 14:25:03 | 2 | MS. TOMASCO:  They're just going to have to wait.  And |
| 14:25:05 | 3 | my suggestion to the parties and my suggestion to the Court is I |
| 14:25:11 | 4 | would argue that with respect to intraMTA, the law is not in |
| 14:25:17 | 5 | flux.  We know what the law is.  There is just a big gaping hole |
| 14:25:19 | 6 | in this particular time period as to what the rate is.  And we've |
| 14:25:23 | 7 | cited to you cases that it's just quantum meruit, you don't get |
| 14:25:27 | 8 | it for free. |
| 14:25:28 | 9 | None of the regulators have set a rate, and they have |
| 14:25:31 | 10 | no reason to because now we've gone to bill-and-keep.  They would |
| 14:25:33 | 11 | be engaging in retroactive rate-making during this time period. |
| 14:25:38 | 12 | Nobody's going to do it.  They're just not.  They don't have any |
| 14:25:41 | 13 | interest nor are you -- nor are you implicating any regulatory |
| 14:25:45 | 14 | foresight on their part because they've already decided this is a |
| 14:25:48 | 15 | dead time period.  This is a huge black hole.  This period right |
| 14:25:52 | 16 | here. |
| 14:25:52 | 17 | There is no issue here.  Tariff applies, tariff |
| 14:25:57 | 18 | applies, tariff applies on interMTA.  That's the long distance |
| 14:26:01 | 19 | wireless to the CLEC traffic. |
| 14:26:03 | 20 | THE COURT:  Well, aren't those tariffs computed in a -- |
| 14:26:08 | 21 | MS. TOMASCO:  No.  The tariffs are filed by the CLEC, |
| 14:26:11 | 22 | the competitive local exchange carrier.  They set the rate.  They |
| 14:26:14 | 23 | set the terms.  They are like a contract.  It's like when I get |
| 14:26:17 | 24 | on the toll way to drive down to San Antonio and I get on 130, I |
| 14:26:21 | 25 | don't sign a contract when I get on there, but when they send me |

14:26:25  1  a bill based on my license plate, I've got to pay it.  Same thing

14:26:28  2  with this tariff.  It's --

14:26:30  3          THE COURT:  Well, but they set -- somebody sets the

14:26:32  4  amount.

14:26:33  5          MS. TOMASCO:  Well, the tariffs are subject to being

14:26:38  6  overturned if they don't comply with the FCC regulations.  But

14:26:42  7  that's not what they're arguing here.  They're arguing that,

14:26:46  8  look, Judge, this is going to require interpretation.  The

14:26:51  9  district courts are the only courts that get to interpret tariffs

14:26:56  10  in contracts.  Only if you say that the tariff doesn't comply

14:26:59  11  with regulations do you go to the FCC.

14:27:03  12          THE COURT:  The circuit courts also get to do it.

14:27:07  13          MS. TOMASCO:  Yes.

14:27:13  14          And so, what we're faced with here is not the state of

14:27:16  15  federal law that is in flux.  We know what the law is.  We need

14:27:19  16  to apply the law to the facts.  How much of the traffic is

14:27:22  17  intraMTA, how much of the traffic is interMTA.  And this little

14:27:29  18  space right here, this continuum in time, what's the appropriate

14:27:33  19  rate?  And it's --

14:27:34  20          THE COURT:  And you're telling me that there's no

14:27:37  21  dispute as to what that tariff is.

14:27:41  22          MS. TOMASCO:  This is not a tariff rate.  This is no

14:27:44  23  tariff, but the rule says reasonable compensation.  There's also

14:27:47  24  a whole line of cases that say where you have no valid tariffs --

14:27:53  25  if this tariff is invalid or you have no valid tariff, then the

14:27:57  1  Court also apply quantum meruit.  Pure state law.  So.

14:28:01  2              THE COURT:  So what is it?

14:28:03  3              MS. TOMASCO:  What is the appropriate rate?

14:28:04  4              THE COURT:  Yes.

14:28:05  5              MS. TOMASCO:  Well, it's going to be based on the

14:28:07  6  incremental cost of services or what you would apply if you were

14:28:10  7  applying state law quantum meruit.

14:28:12  8              THE COURT:  And so, why doesn't the PUC determine that?

14:28:16  9              MS. TOMASCO:  The PUC -- first of all, most of this

14:28:19  10  traffic is in the west coast.  This concerns the debtor Pac-West,

14:28:23  11  which is a California corporation that was acquired by UniPoint

14:28:27  12  Holdings, which is an Austin-based company.  Most of this traffic

14:28:30  13  is in California and Arizona, Utah, the western states.  There is

14:28:36  14  no traffic, to my knowledge, that's in -- that has been brought

14:28:39  15  in this adversary proceeding that is Texas PUC.

14:28:44  16              Pac-West, which is the main plaintiff, is a California

14:28:47  17  company that is in Chapter 11 in Austin, Texas.  The California

14:28:53  18  PUC said in the Pac-West case that you've reviewed, as well as in

14:28:56  19  the North County litigation, they refuse.  They refuse to set

14:29:03  20  this rate.

14:29:04  21              Now, and I've also cited to you a whole line of cases

14:29:07  22  that say where the regulators have failed to act and where we

14:29:11  23  know they're not going to act -- the California PUC says we're

14:29:14  24  not going to act, and yet, I represent the constituencies and the

14:29:19  25  bankruptcies of eight companies, all of the creditors of which

14:29:24  1  have not gotten paid because these guys figured out that there

14:29:30  2  was this loophole.  They kept sending traffic, kept getting

14:29:34  3  invoices and never pay them.  Even though they know some of this

14:29:38  4  is valid interMTA traffic, their own safe harbor filings put the

14:29:43  5  number somewhere between 15 and 39.5 percent that falls into this

14:29:47  6  category.  So we know that 15 to 35 percent is tariff that

14:29:52  7  there's no controversy.  There's no hole.  There's no black hole

14:29:55  8  here.

14:29:56  9         The balance of the traffic intraMTA where you have the

14:30:00  10  hole as to what the rate is, the cases all say, even if the

14:30:04  11  tariff failed, even if it was subject to a tariff but, for

14:30:08  12  whatever reason, the tariff was invalid, you apply quantum

14:30:11  13  meruit.  What's the cost to the bankrupt debtors to provide this

14:30:15  14  service?

14:30:16  15         So what we're here today on, your Honor, is how do we

14:30:21  16  efficiently handle these cases?  The bankruptcy --

14:30:27  17         THE COURT:  Well, let me ask you a question.  What

14:30:30  18  we're here today on is because you filed the bankruptcies here.

14:30:34  19  But you're telling me that most of this activity is in California

14:30:38  20  where they've refused to make these decisions.

14:30:40  21         MS. TOMASCO:  Correct.

14:30:41  22         THE COURT:  So you've come to the heaviest civil docket

14:30:44  23  in the country that's supposed to have five district judges and

14:30:49  24  we have two, and you want us to determine it.

14:30:55  25         MS. TOMASCO:  Your Honor, my --

14:30:56  1          THE COURT:  When California won't.

14:30:58  2          MS. TOMASCO:  California won't determine it.  We filed

14:30:59  3  the bankruptcy in Austin.  Our position is that withdrawal of the

14:31:03  4  reference to this court that is very busy is inappropriate and

14:31:08  5  premature.  And the Court has discretion to delay withdrawal of

14:31:12  6  the reference, for any reason it sees fit, in its discretion to

14:31:15  7  leave it with the bankruptcy court.  When we get to the point

14:31:18  8  where we're going to have a trial, then we can discuss whether or

14:31:22  9  not the bankruptcy court has the power to enter final findings or

14:31:26  10  whether it needs to make a report and recommendation and come to

14:31:28  11  this court with that.

14:31:30  12          THE COURT:  What is -- your definition of trial is a

14:31:33  13  quantum meruit amount?

14:31:36  14          MS. TOMASCO:  If we go through all the pretrial and

14:31:38  15  we're unable to resolve it through dispositive motions, of

14:31:43  16  course, which the Court --

14:31:45  17          THE COURT:  But the ultimate is just to get an amount.

14:31:47  18          MS. TOMASCO:  To get an amount that they owe.  They

14:31:49  19  know they owe something.  The question is how much.

14:31:52  20          And so, my suggestion is, your Honor, we've run 60

14:31:58  21  preference cases through this court efficiently.  We have 140

14:32:02  22  cases to file in this bankruptcy.  We can do it efficiently in

14:32:07  23  the bankruptcy court, withdrawing the reference to this court's

14:32:11  24  already crowded docket as premature, not necessary.  The Court

14:32:15  25  has absolute discretion to relay whether you think that it's a

14:32:20  1  federal issue or whether it's core or noncore, just like you can

14:32:25  2  do with a magistrate.

14:32:26  3       We know you have jurisdiction.  The question is, should

14:32:28  4  you withdraw the reference now, or should we be allowed to

14:32:31  5  proceed in bankruptcy court where we know we can do it

14:32:33  6  efficiently?

14:32:34  7       THE COURT:  So what would you be doing if in the

14:32:37  8  bankruptcy -- my bankruptcy courts are very busy, too.

14:32:42  9       MS. TOMASCO:  My experience, your Honor, where I

14:32:44  10 practice there every day that there is enough time we can get to

14:32:49  11 trial.  I mean, if we had to have a hearing, even a contested

14:32:53  12 hearing, the bankruptcy courts are not setting us in 2015.

14:32:57  13 They're setting us in two weeks.  So I don't think that we have

14:33:00  14 the same issue --

14:33:01  15      THE COURT:  I don't think they're going to set this one

14:33:02  16 in two weeks.

14:33:03  17      MS. TOMASCO:  Not for trial.  What I'm saying for those

14:33:05  18 kinds of things, we have a trial -- I have three trials next week

14:33:10  19 on causes of action that I filed in November.  So if that gives

14:33:15  20 you any idea of what we're talking about in terms of time, the

14:33:17  21 bankruptcy courts certainly are not backed up the way this court

14:33:20  22 is.

14:33:24  23      Your Honor, if -- we have books for you with cases and

14:33:28  24 pleadings, if you would like them.

14:33:33  25      THE COURT:  I just don't know when I'm going to be able

14:33:35  1  to get to them.  But if they're germane to what we're doing, mark

14:33:43  2  them and give them to the clerk.

14:34:02  3          MR. TAUBE:  Your Honor, if I could be heard, Eric Taube

14:34:05  4  on behalf of Leap Wireless and Cricket.

14:34:08  5          Your Honor, among the defendants who have all filed

14:34:11  6  motions to withdraw the reference, we're going to try to make one

14:34:13  7  argument for the Court and not be repetitive.

14:34:16  8          Your Honor, I do want Ms. Toller, if it's appropriate

14:34:19  9  and the Court wants to ask questions relating to what counsel has

14:34:23  10  represented to be straightforward issues, which they're clearly

14:34:25  11  not in matters of straightforward, non-questionable

14:34:29  12  interpretation of the telecom law, which we seriously debate --

14:34:35  13  I'd be more than happy for Ms. Toller to address them.  But we

14:34:39  14  believe, your Honor, that this --

14:34:41  15          THE COURT:  In addition to California refusing, the

14:34:46  16  Feds won't comment on it?  And what happened to the district

14:34:51  17  court of Washington?  It decided not to withdraw the reference

14:35:00  18  but slowly?

14:35:01  19          MR. TAUBE:  Your Honor, I think Ms. Toller can respond

14:35:03  20  because she was part of that.  The district court -- the only

14:35:07  21  district court case that I've seen that involve these type of

14:35:09  22  issues, which is the case that we had cited previously --

14:35:12  23          THE COURT:  I don't know which case it is, Mr. Taube.

14:35:15  24  All I know is the PUC in California referred to it and says it's

14:35:20  25  going to take too much of our time and too much of our resources,

14:35:24  1   wait for it.

14:35:26  2        MR. TAUBE:  Right.  It's because, your Honor, it is a

14:35:29  3   complicated issue of telecom law, which is why we believe under

14:35:33  4   the clear direction --

14:35:34  5        THE COURT:  That's all we have to do is find out what

14:35:36  6   the cost is and have a quantum meruit determination.

14:35:39  7        MR. TAUBE:  To be candid, your Honor, counsel is wrong

14:35:41  8   and we debate that.  Again, Ms. Toller can tell the Court along

14:35:46  9   those issues.

14:35:46  10       MS. TOLLER:  Good afternoon, your Honor.

14:35:48  11       Well, I was actually representing Cricket, as well, or

14:35:53  12  Leap Wireless in the California PUC proceeding, which is where I

14:35:56  13  do a lot of my practice, as well as before the FCC.  And there

14:35:59  14  were a few, I think, maybe overstatements about what the PUC was

14:36:04  15  willing and not willing to do; and what they decided in the case

14:36:06  16  before it, which Pac-West also filed complaints against Cricket,

14:36:10  17  Sprint and T-Mobile in that case, as well, was to weigh in to get

14:36:14  18  some further guidance at the federal level.  They were waiting

14:36:17  19  for two decisions --

14:36:18  20       THE COURT:  Well, they dismissed it twice.  And the

14:36:19  21  second time they dismissed it, I looked at their findings, and

14:36:25  22  they just said it takes -- it's going to take too much of our

14:36:29  23  time and expense.

14:36:30  24       MS. TOLLER:  So what they were particularly focused on

14:36:32  25  in that moment was this issue that counsel for the plaintiffs was

14:36:37   1   mentioning before about what is the reasonable compensation rate.

14:36:40   2   And as you are probably well aware, right, for a court to look at

14:36:43   3   things like incremental costs, which is what plaintiff's counsel

14:36:47   4   said would be one of the factors that would be used to determine

14:36:50   5   what reasonable compensation is, that's a pretty involved

14:36:53   6   process, requiring cost studies and experts and looking at what

14:36:56   7   the underlying cost is of the network, and it's something that

14:37:00   8   regulators do -- used to do in the old days fairly often.  They

14:37:03   9   don't do as much anymore.

14:37:04   10          And the reason that the CPUC wanted to wait is because

14:37:07   11   the way that the FCC's decision in the North County vs. Metro PCS

14:37:13   12   case had come out is they said, we would like California to

14:37:15   13   establish the rate because we have this Rule 20.11 that says, you

14:37:22   14   know, that the carriers have to pay reasonable compensation.  But

14:37:24   15   we can't really decide if the carriers in front of us -- in that

14:37:27   16   case, also a CLEC and a wireless carrier -- have violated that

14:37:31   17   rule unless we know first what the reasonable compensation rate

14:37:35   18   is.

14:37:36   19          And in California, the commission said, well, we're not

14:37:37   20   going to go through all the trouble of establishing a rate, only

14:37:40   21   to potentially have the FCC decide that under this particular

14:37:47   22   requirement, you know, a carrier does not have to, for example,

14:37:50   23   pay if there is no agreement because that is also something that

14:37:53   24   the FCC reserved --

14:37:54   25          THE COURT:  Slow down.

14:37:55  1          MS. TOLLER:  Sorry.  That was also something that the

14:37:57  2  FCC reserved the right to do was to make -- was to find that if

14:38:03  3  in the absence of an agreement, no compensation would be due.

14:38:08  4          They were also -- the CPUC was also waiting for the

14:38:11  5  D.C. Court of Appeals to come -- to rule on the appeal of that

14:38:16  6  MetroPCS case.  And the D.C. Circuit actually just affirmed the

14:38:24  7  FCC's finding and said it was within the FCC's discretion to

14:38:28  8  decide to punt it to the CPUC, to the state to determine the rate

14:38:31  9  if it wanted to.

14:38:32  10          THE COURT:  Well, it's normally what they do.

14:38:35  11          MS. TOLLER:  Yeah.  So what happened -- but, I mean,

14:38:38  12  what's critical is the FCC -- it took the FCC a while, but in

14:38:41  13  2011, they did act.  They came up with a default proxy rate for

14:38:46  14  local traffic, what counsel was calling intraMTA traffic, and

14:38:50  15  they decided that that rate was bill-and-keep; and what that

14:38:53  16  means is, really, that each carrier doesn't charge the other

14:38:57  17  carrier anything.

14:38:58  18          What the FCC decided, instead, was that because both

14:39:03  19  the carrier who originally makes the call and the carrier who

14:39:07  20  receives a call benefit from being able to make that call.  That

14:39:12  21  each carrier should recover the costs of making those calls from

14:39:17  22  their customers, not from each other.

14:39:19  23          THE COURT:  So it's the receipt of the call rather than

14:39:21  24  the termination of the call is the front --

14:39:26  25          MS. TOLLER:  So, I mean, either way, the receiver or

14:39:27   1   the termination.  I was using --

14:39:28   2        THE COURT:  Well, you have to receive it to terminate.

14:39:30   3   But you're talking about the last receiver.

14:39:32   4        MS. TOLLER:  Yes.  Right.  And -- right.  The

14:39:36   5   originally intercarrier compensation was premised on the notion

14:39:40   6   that the calling party, the person who originated the call and

14:39:44   7   the carrier who originated the call, should pay for it because

14:39:47   8   they started it.  And so, all the costs were originally on the

14:39:51   9   calling party.

14:39:52   10       Over time, the FCC and the economists have rethought

14:39:55   11   that construct, and now they've decided the calling party and

14:40:00   12   what they call the call-led party both benefit.  And so, both the

14:40:04   13   end-user customers on both sides benefit and the carriers also

14:40:07   14   both benefit.  And so, that's why the FCC decided in 2011 that it

14:40:12   15   would be bill-and-keep.  That carriers would no longer be able to

14:40:15   16   charge each other for that traffic: they would, instead, have to

14:40:19   17   recover it from their end users.

14:40:20   18       And in making that decision, they made a couple of

14:40:23   19   findings, which are very interesting and potentially helpful in

14:40:26   20   this case.  First of all, they found that the cost of

14:40:30   21   termination, the forward-looking incremental cost of termination

14:40:33   22   is close to zero.  And they also found that particularly for the

14:40:37   23   competitive CLECs, who in this -- I think counsel called it the

14:40:42   24   black hole or this interim time period where they didn't have a

14:40:44   25   way of potentially -- there was no rate set in this time period.

14:40:49  1          The FCC also found that in that time period, because
14:40:57  2   there was no pricing methodology, that the CLECs, the competitive
14:41:01  3   LECs had no basis for reliance on such a methodology in their
14:41:04  4   business model.  And they went, also, to bill-and-keep because
14:41:08  5   they were concerned about arbitrage.  What's been happening a lot
14:41:11  6   in the industry recently is some carriers have figured out that
14:41:15  7   if they can generate a lot of traffic coming into their network
14:41:21  8   by doing things like chat lines, or free conference calling
14:41:26  9   services, or other things that drive a lot of incoming traffic,
14:41:29  10  that that can cause access charges and other compensation --
14:41:33  11  intercarrier compensation charges to be incurred.
14:41:36  12         And because of this, that's another respect that the
14:41:39  13  FCC went to bill-and-keep because they found that there was a lot
14:41:42  14  of this arbitrage -- a lot of arbitrage going on in the industry.
14:41:46  15         THE COURT:  You're going to make my court reporter quit
14:41:50  16  on me.
14:41:51  17         MS. TOLLER:  My apologies.  The court reporters at the
14:41:53  18  PUC have my name and number on a target in front of them, too.
14:41:56  19         THE COURT:  Well, but this one is really mean.  Go
14:42:03  20  ahead.
14:42:04  21         MS. TOLLER:  So, I mean, so that's another reason.  And
14:42:08  22  we would have to sort of see further on, but that is sort of the
14:42:12  23  traffic stimulation or traffic-pumping aspect of this.  The FCC
14:42:17  24  developed new rules relating to that in their 2011 decision, as
14:42:21  25  well, that reformed the whole intercarrier compensation model.

14:42:25   1          So with all due respect to counsel for the plaintiffs,

14:42:27   2   this is a really complicated area of the law.  For the bankruptcy

14:42:32   3   court to move forward and to consider these issues, they will

14:42:35   4   clearly have to not just apply but interpret and analyze the

14:42:40   5   Communications Act, FCC regulations, FCC decisions interpreting

14:42:44   6   those regulations and decisions, and they'll have to do that not

14:42:48   7   only for the local traffic but even for this part, this interMTA

14:42:53   8   traffic down here, as well.

14:42:55   9          MR. TAUBE:  Your Honor -- I'm sorry.

14:42:56   10          THE COURT:  Why?

14:42:57   11          MS. TOLLER:  Okay.

14:42:59   12          THE COURT:  Why do they have to?

14:43:00   13          MS. TOLLER:  Oh, why do they have to?  All right.  So

14:43:03   14   the reason that that's --

14:43:03   15          THE COURT:  It's a long -- I mean, it's going to make a

14:43:05   16   difference -- it's going to be just one, they have a tariff?  Is

14:43:13   17   it based on time?

14:43:15   18          MS. TOLLER:  So the tariff, there's a couple of

14:43:17   19   complications with the tariff.  First of all, for two of the

14:43:21   20   three defendants who are -- yeah.  Defendants that are here

14:43:26   21   before you, Cricket and T-Mobile, we are sure wireless providers

14:43:32   22   in this instance, okay?  Spring is a long distance provider.

14:43:34   23   Their case is a little bit different.

14:43:36   24          But for the pure wireless providers, one of the things

14:43:39   25   that's interesting about this interMTA traffic is that for the

14:43:43  1  wireless carriers, we don't generally send our long distance --

14:43:46  2  that's another name for this -- traffic to CLECs like Pac-West.

14:43:52  3  We use long distance carriers to take that traffic for us.  So we

14:43:56  4  hand it off to long distance carriers.  And the long distance

14:43:58  5  carriers are the ones who have to pay these tariff charges to

14:44:01  6  people like Pac-West.

14:44:04  7          And so, they've actually advanced a novel theory that I

14:44:07  8  haven't seen someone advance before, which is that as the

14:44:10  9  originating carrier, the wireless carrier, notwithstanding the

14:44:13  10  fact that they send traffic over to this long distance carrier,

14:44:18  11  that they still bear the responsibility for paying these tariff

14:44:22  12  charges and that's unusual.  I haven't seen that before.

14:44:25  13          THE COURT:  Is there a passthrough?

14:44:27  14          MS. TOLLER:  No.  I mean, we pay the long distance

14:44:31  15  carriers a charge per minute to take our traffic for us, but

14:44:34  16  then, they bear the responsibility for paying the access charges.

14:44:37  17  And I've never seen anyone before allege that the originating

14:44:40  18  carrier bears that.  And also, at least for my client's

14:44:45  19  perspective, this interMTA is a tiny piece of it.  The bulk of

14:44:48  20  the traffic is up here.

14:44:49  21          And then, the other thing that you'll have to look at

14:44:51  22  on the tariffs, as well, is whether the tariffs are valid and

14:44:55  23  whether they actually apply to the traffic at issue.  The way

14:44:58  24  that at least the California tariffs are written, they are

14:45:01  25  written to not even apply to wireless carriers at all.  That's a

```
14:45:04   1   factor.  And then, because of these arbitrage issues I was
14:45:07   2   talking about before and traffic pumping, there's --
14:45:12   3           MS. TOMASCO:  Your Honor, there's no evidence of
14:45:13   4   traffic pumping.
14:45:14   5           THE COURT:  Oh, we take turns here.  I'll give you
14:45:16   6   another turn.
14:45:16   7           MS. TOLLER:  There's a whole body of case law, and this
14:45:19   8   is referenced in the motions to dismiss that were filed and have
14:45:22   9   been brought up to you.  There's a whole level of analysis that
14:45:26  10   needs to be done about whether, in fact, the traffic is
14:45:29  11   terminating to an actual end user, and if it's not, you're not
14:45:34  12   allowed to charge access charges for it.  And so, that will be
14:45:36  13   another complex federal law issue that this court will need to
14:45:40  14   decide.
14:45:41  15           MR. TAUBE:  And, your Honor, I think, if the Court will
14:45:43  16   permit me, that's where the bankruptcy issue comes in, under 28
14:45:48  17   U.S.C. 157(b).  Because this court is going to have to deal with
14:45:52  18   all of the issues that Ms. Toller just described, it is not -- I
14:45:59  19   believe that the withdrawal of the reference is mandatory, not
14:46:03  20   even permissible, because you're dealing with other federal law
14:46:07  21   and issues that arise in connection with the bankruptcy case.
14:46:14  22           The case, your Honor, that has been cited, which is
14:46:17  23   fairly identical you, United Access Telecom vs. Northern New
14:46:23  24   England Telephone Operations case, district court presented with
14:46:26  25   very similar issues and did exactly what we have asked this court
```

14:46:30   1   and what the other defendants have asked this court to do is to

14:46:32   2   withdraw the reference, based upon the mandatory provision of 28

14:46:35   3   U.S.C. 157.  And, your Honor, there are plenty of reasons.

14:46:41   4              THE COURT:  What did he do, or she?

14:46:44   5              MR. TAUBE:  I'm sorry, your Honor?

14:46:46   6              THE COURT:  You said there's another one that you've

14:46:47   7   asked somebody to do the same thing.

14:46:49   8              MR. TAUBE:  No, your Honor.  In another case, in

14:46:50   9   another district, that is exactly the same thing that happened,

14:46:54  10   very similar circumstance.

14:46:55  11              THE COURT:  Well, you're just saying that they made a

14:46:57  12   determination they got to apply federal law and regulations.

14:47:00  13              MR. TAUBE:  Yes, sir.  That's correct.

14:47:02  14              THE COURT:  So you want to turn me into a PUC is what

14:47:06  15   you want to --

14:47:07  16              MR. TAUBE:  Well, your Honor, we actually don't want

14:47:07  17   the Court -- we actually move --

14:47:09  18              THE COURT:  No, no.  You don't want this ever

14:47:11  19   determined.  I understand.  Your clients don't want to pay a

14:47:13  20   dime.

14:47:14  21              MR. TAUBE:  We want the complaint dismissed.

14:47:15  22              THE COURT:  You don't want it determined.  You just

14:47:17  23   want to stretch it out.  That's why she's wanting to go to

14:47:20  24   bankruptcy to get this apparatus to -- just like a turnover.  I

14:47:26  25   wouldn't permit that, anyway, though, I can tell you that.

14:47:29  1  You've got to have to determine it, one way or the other, if

14:47:33  2  there is, because nobody else apparently is very interested in

14:47:38  3  it.

14:47:38  4          MR. TAUBE:  I understand, your Honor.

14:47:39  5          THE COURT:  So why should I be?

14:47:40  6          MR. TAUBE:  Because I think, your Honor,

14:47:42  7  jurisdictionally, you're the only court that can.  Bankruptcy

14:47:44  8  court doesn't -- well.

14:47:46  9          THE COURT:  If California -- if this is a California

14:47:49  10 problem, we don't have to take it.  They can --

14:47:54  11         MR. TAUBE:  Well, I don't mean it that way, your Honor.

14:47:55  12 I meant between this court and the bankruptcy court, you are the

14:47:59  13 only court that has jurisdiction to do it.  So --

14:48:01  14         THE COURT:  Now, I could have the bankruptcy court do

14:48:03  15 anything.  I could have them pretrial a case all the way to jury

14:48:08  16 selection and do that.  I'm doing it in Crescent right now.  I

14:48:15  17 can't handle another 200-and-some cases.  And I'm consolidating

14:48:21  18 other cases, and I'm telling them I don't really care.  There are

14:48:26  19 interlocutory orders you can't appeal, you'd better prepare for

14:48:30  20 trial.  There's a lot of things I can do.

14:48:34  21         MR. TAUBE:  I understand, your Honor.

14:48:34  22         THE COURT:  I'm not near as dumb as they say, you know.

14:48:37  23 The truth of the matter is, it's -- from what little I've

14:48:52  24 learned, it's a failing that nobody wants to take the time and

14:48:54  25 expense to do it or to determine so that some appellate court can

14:48:59  1   determine whether it's going to be a charge or not.

14:49:08  2         Already, it seems to me, that looks like a case I could

14:49:16  3   take a special master in and work it out in six, seven weeks.

14:49:27  4   Y'all would be working full-time.  But if we got to the PUC,

14:49:30  5   that's the only way I can do it.  There's just no way in the

14:49:32  6   world I can try it.

14:49:34  7         MR. TAUBE:  I understand, your Honor.

14:49:35  8         In terms of how the Court handles its docket, obviously

14:49:38  9   that's clearly within the Court's discretion.  I think for the

14:49:40  10  jurisdictional standpoint that it is, unfortunately, in this

14:49:44  11  court's -- in the avenue of this court's jurisdiction.

14:49:48  12        THE COURT:  Well, I thought I learned from the master.

14:49:51  13  Judge Nowlin has what is called a special docket.  And there are

14:49:59  14  a lot of other judges have special dockets.  I try everything

14:50:02  15  that comes in.  But you all notice other judges have never tried

14:50:10  16  a patents case.

14:50:11  17        MR. TAUBE:  I understand, your Honor.  And I'm

14:50:12  18  certainly aware of Judge Nowlin's --

14:50:13  19        THE COURT:  I don't -- I just have to think about it.

14:50:17  20  I just don't know -- first off, I don't have the -- right now,

14:50:25  21  today is the last day that we know we can operate,

14:50:29  22  notwithstanding what you read about in the papers.  We don't know

14:50:35  23  how long we're going to be able to operate with the staffs we

14:50:39  24  have.

14:50:40  25        Okay.  Anything further from that side?

14:50:49   1          MR. SUGDEN:  Your Honor, very briefly, Will Sugden,

14:50:53   2   again, for T-Mobile.

14:50:53   3          I wanted to address the issue of remand with you, and

14:50:57   4   this is the issue of remand to the bankruptcy court and the scope

14:51:00   5   of the discretion on the remand.

14:51:04   6          THE COURT:  Well, I haven't remanded.  I haven't

14:51:07   7   withdrawn yet.

14:51:09   8          MR. SUGDEN:  Correct.  And there was a suggestion made

14:51:12   9   in the debtors' papers, in the plaintiff's papers that even if

14:51:16  10   you found that this was a case that required withdrawal of the

14:51:19  11   reference under the mandatory provisions, that you nonetheless

14:51:23  12   remand it to the bankruptcy court for pretrial matters, and I

14:51:26  13   wanted to address that point.  It was -- Ms. Tomasco raised it

14:51:31  14   briefly in her presentation.

14:51:33  15          We have done some looking on that.  Again, this is a

14:51:37  16   case that, in our view, falls within the mandatory withdrawal

14:51:41  17   provisions rather than the permissible withdrawal provisions,

14:51:44  18   giving the folks on this side of the room, in our view, an

14:51:49  19   entitlement to come up to district court to be handled in

14:51:53  20   accordance with your Honor's docket.  We have looked for cases

14:51:57  21   that remand to the bankruptcy court, cases that are found in it

14:52:04  22   to require mandatory withdrawal of the reference.

14:52:07  23          The leading case, the only case that we've really been

14:52:10  24   able to find that's on point is a case arising out of the Pan Am

14:52:14  25   bankruptcy.  The cite to it is 133 B.R. 700.  What that was, I

14:52:19  1   just wanted to distinguish that from this case and show your

14:52:22  2   Honor how very different it is and why we really do have an

14:52:27  3   entitlement to be in district court.

14:52:29  4          What that was was a situation where the PBGC, Pension

14:52:34  5   Benefit Guarantee Corporation, had filed claims under three

14:52:37  6   terminated plans that were sponsored by Pan Am.

14:52:42  7          THE COURT:  Counsel.

14:52:44  8          MR. SUGDEN:  Yes.

14:52:46  9          THE COURT:  I would never withdraw the reference.  I

14:52:51  10  would just tell the bankruptcy court to manage the case.

14:52:58  11         MR. SUGDEN:  Understood.

14:52:59  12         THE COURT:  That's what I've done since I've been on

14:53:01  13  the bench.

14:53:02  14         MR. SUGDEN:  Okay.

14:53:02  15         THE COURT:  Because you're right, when I have the puppy

14:53:06  16  in my hand, I have to potty-train.

14:53:12  17         MR. SUGDEN:  Understood, your Honor.

14:53:13  18         Well, with that, I will conclude my remarks, unless

14:53:15  19  your Honor has any questions.

14:53:16  20         THE COURT:  No.  I think it's probably a good

14:53:18  21  conclusion.

14:53:18  22         MR. SUGDEN:  Okay.  Thank you.

14:53:23  23         MS. TOMASCO:  Your Honor, I just want to make a couple

14:53:27  24  of points.  I have a bankruptcy estate to administer.  I've got a

14:53:32  25  couple of hundred creditors, I've got eight debtors.  I've got to

14:53:37  1  get money to my unsecured creditors.  If we do what the

14:53:40  2  defendants want us to do, we're going to go away before they have

14:53:43  3  to pay a dime, even though they know, I know, everybody in this

14:53:47  4  room knows they need to pay us.

14:53:49  5       So the question is -- I'm reminded of capable of

14:53:57  6  repetition, yet, evading review with respect to CLEC debtors such

14:54:00  7  as my client, and that is that we are never going to get

14:54:03  8  resolution of this regulatory black hole if we wait for the

14:54:07  9  regulators to act.  We know what the rules are.  We know what the

14:54:11  10 rules are.  The rules are reasonable compensation.  And there's

14:54:15  11 no fewer than six cases in identical circumstances where there

14:54:20  12 were regulatory holes that -- we cite them in our brief.  The

14:54:25  13 most prominent among those is the Manhattan Telecommunications

14:54:28  14 case out of the Southern District of New York where they said,

14:54:32  15 we've got to do something.

14:54:33  16      And here, you can see what they want, defer, deflect,

14:54:38  17 ignore.  We've been sending them invoices for eight years that

14:54:43  18 they've ignored.  Eight years, they've not paid a dime, even

14:54:46  19 though they've been getting an invoice.  Why?  Because they know

14:54:50  20 that nobody's going to enforce the law because they're always

14:54:54  21 going to cite to this -- what they call regulatory uncertainty.

14:54:57  22 Now we know it's a regulatory black hole.

14:55:00  23      Yes, the FCC has moved intraMTA traffic to

14:55:04  24 bill-and-keep.  We have a black hole in between the 2005 T-Mobile

14:55:08  25 declaratory ruling and the Connect America decision where there's

14:55:11  1   no rate, there's nothing to be done.

14:55:14  2          THE COURT:  What about the counsel's -- in their papers

14:55:19  3   and they mention here that on the -- because any call that you

14:55:28  4   accept and terminate, you made -- your client makes money that

14:55:32  5   there shouldn't be any charge.

14:55:34  6          MS. TOMASCO:  Well, our client does incur costs.  Our

14:55:37  7   client is in bankruptcy as a result of the practice -- in part,

14:55:40  8   because of the practices of defendants.  We have $40 million in

14:55:44  9   charges that are similar to these charges that we need to try to

14:55:47 10   collect.  And it's not -- if it were factually true that there's

14:55:53 11   no incremental costs to terminating an intraMTA CMRS call, if

14:55:59 12   that were true, then they could be -- they could prove that at

14:56:03 13   trial.  They could prove that there's no incremental costs.

14:56:05 14          THE COURT:  No.  My question is, what is your position

14:56:07 15   with regard that they say somebody has made the determination?  I

14:56:12 16   don't know.

14:56:12 17          MS. TOMASCO:  Nobody has made a determination.  The FCC

14:56:14 18   did not make that determination.  The factually -- that's why

14:56:17 19   they remanded it to the California PUC.  You know what the

14:56:19 20   California PUC said?  The California PUC said, you want us to

14:56:23 21   undertake extensive cost studies -- this is for everybody, not

14:56:27 22   just one plaintiff, one defendant.  This is everybody.  Extensive

14:56:30 23   cost studies with all these participants on what the rate should

14:56:33 24   be, right?

14:56:34 25          And they said, no thank you, because you know why?

14:56:37  1    It's retrospective rate-making.  Cannot possibly apply to the

14:56:41  2    future because the future is bill-and-keep, right?  We know that

14:56:45  3    the technology has advanced.  And yes, things have gotten less

14:56:50  4    expensive to terminate calls as technology has advanced.  That

14:56:53  5    doesn't mean that during this time period on intraMTA -- and

14:56:57  6    let's not forget, we have interMTA, which is, unquestionably,

14:57:01  7    tariff, that we can deal with that on a contractual basis.  It

14:57:04  8    doesn't require interpretation of telecommunications law.

14:57:08  9         But on intraMTA, the cases that have addressed it --

14:57:11  10   and I have a couple if you want me to point them out to you --

14:57:15  11   they say if there is this regulatory vacuum and the regulators

14:57:19  12   will not speak, district courts are perfectly capable of applying

14:57:25  13   quantum meruit.  If, for example, our tariff, as she suggests, is

14:57:29  14   invalid, for whatever reason, the district court can and should

14:57:33  15   apply quantum meruit.

14:57:35  16        THE COURT:  Well, I'd be appointing -- let's just say I

14:57:39  17   go along with you and I come out with the figures, I'll be --

14:57:45  18   that figure is going to be utilized in California apparently.

14:57:50  19        MS. TOMASCO:  No.  It would only apply -- if California

14:57:52  20   were to do a rate study and set a rate for California, it would

14:57:57  21   be a proceeding in which you have all the CLECs and all the CMRS

14:58:01  22   providers all participating.

14:58:03  23        THE COURT:  No, no, no.  Your company --

14:58:05  24        MS. TOMASCO:  Okay.

14:58:05  25        THE COURT:  -- would use it.

14:58:06  1          MS. TOMASCO:  My company no longer exists.  My company

14:58:11  2   has been sold.  My debtor has been sold.  We are talking about

14:58:14  3   the past.  This has no prospective application whatsoever.  This

14:58:19  4   is just about the past in two respects:  One, my company's no

14:58:24  5   longer taking calls.  All of our equipment has been sold to a

14:58:27  6   purchaser pursuant to a 363 sale.  Number two, we know as a

14:58:31  7   result of the Connect America order that we are talking about

14:58:35  8   only retrospective time periods because everything now is

14:58:38  9   bill-and-keep.

14:58:40  10         THE COURT:  Then a determination --

14:58:43  11         MS. TOMASCO:  This is just --

14:58:43  12         THE COURT:  -- of no damages would end your quest.

14:58:47  13         MS. TOMASCO:  If factually they could prove that there

14:58:50  14  were no damages, we incurred no costs in providing this

14:58:54  15  service --

14:58:54  16         THE COURT:  Actually, you would have to prove what

14:58:56  17  damages there are.  You would have the burden.

14:58:59  18         MS. TOMASCO:  Correct.  Yes.  We could prove quantum

14:59:01  19  meruit, unjust enrichment, all of the quasi contracts if, for

14:59:05  20  whatever reason, there is not an applicable rate or tariff.

14:59:08  21         THE COURT:  If you did that in a lawsuit, that was the

14:59:10  22  lawsuit, you had a jury, you would just be determining, one, if

14:59:21  23  there's a debt, if there is a debt, how much, just like any other

14:59:24  24  lawsuit.

14:59:25  25         MS. TOMASCO:  That's correct, your Honor.

| | | |
|---|---|---|
| 14:59:26 | 1 | THE COURT:  And there's not anything that the FCC or |
| 14:59:33 | 2 | the state rate people. |
| 14:59:36 | 3 | MS. TOMASCO:  One of the reasons why we defer to |
| 14:59:39 | 4 | regulators is because it has prospective effect.  Particularly in |
| 14:59:43 | 5 | this case, there is no prospective effect.  We are talking just |
| 14:59:46 | 6 | about how much they owe.  That's it.  The debtor is not |
| 14:59:51 | 7 | continuing, and the regulatory black hole, that time period ended |
| 14:59:56 | 8 | on December 29th, 2011. |
| 15:00:01 | 9 | THE COURT:  Yes, ma'am. |
| 15:00:03 | 10 | MS. TOLLER:  I think the one critical piece that |
| 15:00:07 | 11 | counsel for the plaintiffs is leaving out, though, is to even |
| 15:00:09 | 12 | look back to decide what compensation is owed for that past |
| 15:00:13 | 13 | period, if any. |
| 15:00:14 | 14 | THE COURT:  Juries do that every single day. |
| 15:00:17 | 15 | MS. TOLLER:  Yeah.  But we also need to decide and |
| 15:00:20 | 16 | interpret the regulatory framework that is in place, and that, in |
| 15:00:24 | 17 | fact, is not as clear as she would have it be.  So -- |
| 15:00:27 | 18 | THE COURT:  Juries get instructions in every lawsuit on |
| 15:00:30 | 19 | how to determine damages, every single day.  If this is just a |
| 15:00:37 | 20 | liability in the past that can be an asset to a bankrupt estate, |
| 15:00:45 | 21 | I'm not so sure that this is near as complicated as y'all are |
| 15:00:48 | 22 | making it. |
| 15:00:50 | 23 | MS. TOLLER:  The one thing, your Honor, that the |
| 15:00:53 | 24 | tariffs that they're relying on are very similar to a lot of |
| 15:00:56 | 25 | tariffs that folks still have in place today.  So whatever |

15:00:59  1  decision that this court makes, I think may well have some

15:01:03  2  impact, if it determines how to apply federal law and if it

15:01:07  3  determines what that reasonable -- if it determines a rate for

15:01:11  4  reasonable compensation, looking back.  There are other disputes

15:01:14  5  out there, not just here, that are raising these issues.

15:01:18  6          One last point about California, too, just to think

15:01:21  7  about it.  California invited Pac-West to come back and re-file

15:01:26  8  their claim when they wanted to, after the D.C. Circuit issued

15:01:31  9  their decision, or even before if it took too long.  Pac-West

15:01:35  10  declined to do that.  They have not done it.  So it's not the

15:01:37  11  case that the PUC has refused to do this.  They wanted some more

15:01:40  12  guidance from the FCC, which I think they have.  But Pac-West

15:01:44  13  chose not to come back there.  They chose to come here, instead.

15:01:48  14          THE COURT:  Well, they're not in business anymore.

15:01:50  15          MS. TOLLER:  Well, that's true.

15:01:55  16          THE COURT:  All right.  Within ten days, I want each

15:01:58  17  side to give me a pleading.  You can call it anything you want.

15:02:14  18  I take it there's unanimity here that we're just dealing with the

15:02:22  19  possible liability in the past.  And I want it no more than three

15:02:30  20  pages -- that's about my comprehension rate -- and as to why this

15:02:39  21  can't be determined in a trial.  And then, I'll look at that and

15:02:45  22  look at these books and --

15:02:47  23          MR. TAUBE:  Your Honor, if I could, I'm not sure that

15:02:50  24  -- at least from our client's, I'm not sure that we fight that at

15:02:54  25  all.  We think it can be determined in one trial, along with the

| 15:02:57 | 1 | other defendants. |

15:02:57  1    other defendants.

15:02:59  2              THE COURT:  Well, with all of the interpretations I'm

15:03:04  3    going to have to make, and all of the federal stuff, and all of

15:03:08  4    that stuff?

15:03:08  5              MR. TAUBE:  Yes, sir.

15:03:09  6              THE COURT:  Then write it in one page.

15:03:16  7              MR. TAUBE:  Yes, sir.  Only one sentence, your Honor.

15:03:18  8    Thank you.

15:03:19  9              THE COURT:  Okay.  Motion for extension of time to file

15:03:31  10   a brief, even though you'll see it's fully briefed, is granted.

15:03:37  11   Joint motion to deem matter fully briefed is dismissed.  I have

15:03:43  12   no idea if it's fully briefed or not.  I have a hunch that I may

15:03:47  13   want additional briefing before I decide to take this on.

15:03:52  14             And the motion for leave to file -- exceed the page

15:03:57  15   limits, of course, is granted.  All the motions to appear pro hac

15:04:01  16   vice are granted.  Just remember one thing.  I've said it many,

15:04:07  17   many times.  It doesn't really make any difference how long your

15:04:10  18   pleading is.  I only read the first twelve pages.

15:04:14  19             All right.  Ten minutes and I'll be with the criminal

15:04:17  20   docket.

          21             (End of proceedings.)

          22

          23

          24

          25

1                              * * * * * *

2

3

4    UNITED STATES DISTRICT COURT)

5    WESTERN DISTRICT OF TEXAS    )

6

7        I, LILY I. REZNIK, Official Court Reporter, United States

8    District Court, Western District of Texas, do certify that the

9    foregoing is a correct transcript from the record of proceedings

10   in the above-entitled matter.

11       I certify that the transcript fees and format comply with

12   those prescribed by the Court and Judicial Conference of the

13   United States.

14       WITNESS MY OFFICIAL HAND this the 24th day of October, 2013.

15

16

17                                    /S/ Lily I. Reznik
                                      LILY I. REZNIK, CRR, RMR
18                                    Official Court Reporter
                                      United States District Court
19                                    Austin Division
                                      501 West 5th Street, Suite 4153
20                                    Austin, Texas 78701
                                      (512)391-8792
21                                    Certification No. 4481
                                      Expires:  12-31-14
22

23

24

25